**TEXTRON FINANCIAL**

Textron Financial Corporation, Subsidiary of Textron Inc.

# CREDIT AND SECURITY AGREEMENT

This Credit and Security Agreement (this "Agreement") is entered into as of the effective date below by and between Enterprise Direct L.L.C., an Arizona Limited Liability Company ("Debtor") and Textron Financial Corporation, a Delaware corporation ("Secured Party"). For purposes of this Agreement, any person or entity which directly or indirectly controls, is controlled by, or is under common control with a party to this Agreement, shall be deemed an affiliate of such party.

1. Security Interest.
In order to secure all present and future obligations of Debtor and/or its affiliates owing to Secured Party and/or its affiliates, whether under this Agreement or any other current or future agreement, Debtor hereby grants to Secured Party and its affiliates a security interest in the following properties, assets and rights of the Debtor, wherever located, whether now owned or hereafter acquired or arising and all proceeds and products thereof (all of the same being hereinafter called the "Collateral"): all personal and fixture property of every kind and nature including without limitation all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts (including health-care insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, supporting obligations, any other contract rights or rights to the payment of money, insurance claims and proceeds, and all general intangibles (including all payment intangibles).

2. Advances and Eligibility.
Provided no Event of Default, as hereinafter defined, then exists, and upon request by Debtor, Secured Party may advance funds (each, an "Advance") for acquisition, financing and/or refinancing by Debtor of inventory (individually and collectively, "Inventory") and/or for such other purposes as are acceptable to Secured Party. Debtor understands and agrees that each Advance will be solely at Secured Party's discretion, and Debtor expressly disclaims any right to expect otherwise as a result of any course of dealing between Debtor or Secured Party, any particular need for any such Advance by Debtor, Secured Party's dealings with others, Secured Party's arrangements with any Manufacturer, or otherwise. To be eligible for an Advance, Inventory must be: (a) serialized, unless otherwise agreed to by Secured Party; (b) adequately described on an invoice issued to Debtor by an approved manufacturer or distributor (each, a "Vendor"); (c) approved by Secured Party, in Secured Party's discretion, for financing pursuant to a program authorized by the applicable Vendor; and (d) encumbered by a first priority perfected security interest in favor of Secured Party.

3. Financing Terms.
Secured Party will provide to Debtor, in a manner chosen by Secured Party from time to time, a Statement of Financial Transaction, program letter, approval letter, billing statement or other documentation, as applicable, identifying Inventory and the applicable financial terms for an Advance (each, a "Finance Terms Document" or "FTD"). Any such FTD may, among other things, provide for a maturity rate of interest as set forth in an applicable FTD, (provided no Event of Default has been declared) to be paid when Collateral has aged (the terms of such aging to be set forth in an FTD) and/or a default rate of interest (or other amounts associated with a default by Debtor), which shall be payable by Debtor upon the occurrence of any Event of Default (as defined below) or as otherwise set forth in the FTD. Debtor's failure to notify Secured Party in writing of any objection to a particular FTD within ten (10) days of the date such FTD is first made available to Debtor shall constitute Debtor's: (a) acceptance of all terms thereof; (b) agreement that Secured Party is financing such Inventory at Debtor's request; and (c) agreement that such FTD will be incorporated herein by reference. If Debtor timely objects to the terms of any FTD and such objection is not resolved within three (3) business days, Debtor will pay Secured Party for such Inventory, and the terms of such FTD shall be deemed for all purposes to be, in accordance with the most recent terms for similar Inventory to which Debtor has not objected; provided, however, if there are no prior terms, until resolution by the parties hereto, interest shall accrue at the lesser of (i) *The Wall Street Journal* prime rate plus six (6%) percent per annum or (ii) the maximum lawful contract rate of interest permitted under applicable law.

4. Payment Terms; Fees.
   (a) Payment Terms. Debtor promises to pay to Secured Party the original invoice cost ("Invoice Cost") of each item of Inventory financed or refinanced for Debtor by Secured Party pursuant to each applicable FTD, together with interest and charges on the Invoice Cost and/or fees on the account as specified in each applicable FTD and this Agreement (collectively, the "Total Debt"). Unless otherwise specified in any applicable FTD, interest shall be payable monthly, in arrears, and shall be due and payable by the fifteenth (15th) day of the month following the month in which such interest accrues. For any month, the "Prime" rate shall be the greater of (a) the highest rate of interest announced during such period by JPMorgan Chase Bank or other money center bank selected by Secured Party from time to time, or (b) any "Minimum Prime" rate set forth in any applicable FTD. Interest shall be calculated based upon a 360 day year unless otherwise set forth in any applicable FTD. All payments hereunder and under each FTD shall be made payable to Secured Party and delivered to the address specified by Secured Party from time to time or paid in such manner as Secured Party may specify from time to time. As to all payments made by or on behalf of Debtor with respect to its obligations owed to Secured Party, Secured Party may apply any payments received to the obligations, or any portion thereof, in any manner and in any order as Secured Party may determine in its sole discretion, notwithstanding contrary instructions received. Application of payments made on Debtor's account may occur up to two (2) business days after deposit into Secured Party's account to allow for clearance of funds.
   (b) Fees. Debtor agrees to pay to Secured Party each of the following fees if assessed by Secured Party: (i) an "Audit Fee" for each audit conducted as determined by Secured Party, which shall be equal in each case to the Secured Party's actual out-of-pocket expenses incurred in connection with such audit or any minimum audit fee amount established by Secured Party (with audits to be conducted as frequently as Secured Party deems prudent, in its sole discretion); (ii) a "Returned Payment Fee", in each case in which Secured Party receives a check, ACH electronic payment or other amount in payment of Debtor's obligations owing to Secured Party and such payment is returned or rejected by Secured Party's bank for insufficient funds or for any other reason, even if it is paid subsequently, of up to the lesser of (a) the maximum amount permitted by law or (b) $250.00; and (iii) a "Late Fee" equal to five percent (5%) of any payment of fixed principal (other than a final, balloon installment of principal due on maturity or on sale of the collateral) and interest, or interest and/or flat or other charges, in each case that is not received by Secured Party on or before the twenty-fifth (25th) day of the month such payment becomes due, and on the same day of each successive calendar month thereafter until such past due amount is received by Secured Party; and (iv) any such additional fees and/or changes to the above-listed fees as Secured Party shall implement from time to time in connection with the servicing and/or administration of Debtor's account with Secured Party, to be effective as of the notice date, or such other future date as Secured Party shall advise, and in each case upon prior notice to and acceptance by Debtor (which notice may, but shall not be required to, be included in a Statement of Financial Transaction or other FTD), which acceptance shall be conclusively evidenced by Debtor's request for Advances following Secured Party sending notice to Debtor of a particular additional and/or changed fee. Delivery of any such notice by facsimile or other electronic transmission shall be equally effective as delivery of a printed notice. Debtor further agrees to pay Secured Party the maximum fees permitted by applicable law in respect of any requests from Debtor for accounting, listings of Collateral, statements of account or explanations of surpluses or deficiencies. Debtor and Secured Party further agree that such fees do not constitute charges for the use of money.

5. Disclaimer of Warranties; Unconditional Nature of Obligations.
DEBTOR HEREBY ACKNOWLEDGES AND AGREES THAT: (a) SECURED PARTY IS NOT THE MANUFACTURER OR THE SELLER OF THE COLLATERAL; AND (b) SECURED PARTY HAS NOT MADE ANY WARRANTY OR REPRESENTATION WITH RESPECT TO THE



Exhibit A

COLLATERAL OF ANY NATURE OR KIND WHATSOEVER, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE MERCHANTABILITY OF THE COLLATERAL, ITS FITNESS FOR A PARTICULAR PURPOSE, ITS COMPLIANCE WITH APPLICABLE LAWS AND REGULATIONS OR ITS NON-INFRINGEMENT OF THE RIGHTS OF OTHERS. DEBTOR IRREVOCABLY WAIVES ANY CLAIMS AGAINST SECURED PARTY WITH RESPECT TO THE INVENTORY AND OTHER COLLATERAL, WHETHER FOR BREACH OF WARRANTY OR OTHERWISE. DEBTOR AGREES THAT ITS OBLIGATIONS TO SECURED PARTY WITH RESPECT TO COLLATERAL FINANCED BY SECURED PARTY SHALL BE ABSOLUTE AND UNCONDITIONAL AT ALL TIMES AFTER SECURED PARTY HAS ADVANCED OR COMMITTED TO ADVANCE ALL OR ANY PART OF THE INVOICE COST OF SUCH COLLATERAL TO THE SELLER THEREOF. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, DEBTOR WILL NOT DELAY PAYMENT OF ANY OBLIGATIONS TO SECURED PARTY, OR ASSERT ANY DEFENSE OR SET-OFF WITH RESPECT TO SUCH OBLIGATIONS, DUE TO A DISPUTE BETWEEN DEBTOR AND A VENDOR OF INVENTORY AND REGARDLESS OF ANY DISCOUNT OR ALLOWANCE PROVIDED BY A VENDOR TO DEBTOR.

6. Location of Collateral.

Debtor agrees that the Collateral shall at all times remain personal property, shall not become affixed to or form a part of any real estate without the consent of Secured Party, and shall be located at Debtor's place(s) of business or at any other locations otherwise approved in writing by Secured Party from time to time. Secured Party retains the right to demand additional protection for the approval of a new location for Inventory, which includes, but is not limited to, a properly executed landlord/lienholder waiver(s). Debtor shall not remove any of the Collateral from such location(s) (except for moving Collateral between or among approved locations) or change its principal place of business without the prior written consent of Secured Party.

7. Debtor's Representations, Warranties and Agreements.

Debtor represents and warrants to Secured Party that: the execution of and performance by Debtor under the terms of this Agreement, each FTD and related financing documents have been approved for Debtor by all necessary corporate or other action as applicable; Debtor is duly formed and is in good standing and qualified to do business in its state of organization (if applicable) and in the state(s) in which its place(s) of business is (are) located; the execution and delivery of this Agreement does not contravene any of Debtor's organizational documents or any other agreement, document or instrument to which Debtor is a party; this Agreement is a valid, binding and enforceable agreement of Debtor; Debtor lawfully possesses and owns each item of Collateral financed or refinanced by Secured Party for Debtor; the Collateral is free from, and will remain free from, all liens or other encumbrances, except for the security interest granted hereby and any security interests that are junior in priority to the security interest granted hereby; Debtor is a merchant engaged in the business of selling the Inventory and other personal property of a kind similar to the Inventory; all information supplied and statements made by Debtor in any financial statement or other document delivered to Secured Party at any time is, and shall be, true, correct, complete and genuine when delivered; the Debtor is not a party to or the subject of any lawsuit, governmental investigation or proceeding or material dispute with any party, except as previously disclosed in writing to Secured Party; and there has been no material adverse change in Debtor's credit worthiness, financial position or in the information provided by Debtor to Secured Party in the credit application or otherwise from the date of submission of such information through the date of Debtor's signing of this Agreement. Each request for an Advance by Debtor reaffirms Debtor's representations and warranties contained herein as of the date of such request.

Debtor agrees: to defend, at Debtor's own expense, any action, proceeding or claim affecting the Collateral; to give notice to Secured Party of (i) any defect or non-conformity in any shipment of the Inventory financed by Secured Party, or any claim of a right to reject or revoke acceptance of such Inventory for any reason, no later than five (5) days after delivery of such Inventory and (ii) any event or circumstance that has caused, or would reasonably be expected to cause, a material adverse effect on the Debtor, its business or its financial prospects, immediately upon becoming aware of such event or circumstance; to pay promptly all taxes, assessments, license fees and other public or private charges when levied or assessed against the Collateral, this Agreement, any FTD or payments to be made in connection therewith (such obligation shall survive the termination of this Agreement); to pay all transportation and storage charges on the Collateral, and pay all rents and other amounts, if any, for the use of premises on which Debtor keeps any Collateral; to obtain, upon the request of Secured Party, waivers of interest and/or non-disturbance agreements from landlords, lienholders, warehousemen and/or bailors as to locations where any Collateral is located; that if a certificate of title is required by law with respect to any item of Collateral, Debtor shall obtain such certificate and shall note the security interest of Secured Party thereon and shall do everything necessary or expedient to preserve or perfect the security interest of Secured Party therein; that Debtor will not misuse, fail to keep in good repair, secrete or, except with Secured Party's prior written consent, rent, lend, assign or otherwise transfer any of the Collateral, or use the Collateral for any purpose other than in accordance with accepted industry practices; that Secured Party may enter upon Debtor's premises at any reasonable time to inspect the Collateral and Debtor's books and records pertaining to the Collateral with the full cooperation and assistance of Debtor; to take all such actions reasonably requested by Secured Party to further implement and give effect to the agreements contained in this Agreement; and to indemnify and hold harmless Secured Party and its affiliates from any claims, losses, costs and expenses asserted by Debtor, any customer of Debtor or any other party relating to or arising out of this Agreement or any Collateral.

8. Disposition of Inventory by Debtor; Release of Lien.

Both Debtor and Secured Party intend for Debtor to sell the Inventory, but only in the ordinary course of its business as Debtor normally sells such Inventory. Therefore, Debtor may sell any item of Inventory provided that: (a) Debtor is not in default hereunder, (b) the price obtained for such item of Inventory is not less than the unpaid Total Debt attributable thereto, and (c) unless otherwise agreed to by Secured Party in writing in a particular case, Debtor holds all of the proceeds of any such sale in trust for, and immediately remits the unpaid Invoice Cost of such item of Inventory to, Secured Party. Debtor acknowledges that Secured Party may extend financial accommodations, in an amount equal to all or a portion of the Debtor's sales price, to the purchaser of an item of Inventory from Debtor. In such a case, the unpaid Invoice Cost of such item of Inventory and the amount to be financed by Secured Party may be offset against one another. Upon demand by Secured Party, Debtor shall immediately remit to Secured Party the full unpaid Invoice Cost of any item of Inventory (which amount shall be applied in repayment of the Advance(s) relating to such item of Inventory or otherwise as determined by Secured Party in its sole discretion) as to which (i) Debtor receives any deposit or similar amount from a contemplated purchaser and/or (ii) Debtor enters into a contract to sell such item of Inventory. The immediately preceding sentence shall not apply to any Inventory financed by Secured Party under a scheduled payment or other non-"pay as sold" program.

9. Insurance and Risk of Loss.

Debtor shall bear the entire risk of loss or destruction of, or damage to, the Collateral. Debtor will procure and continuously maintain "all risk" property insurance covering each item of Collateral for the full replacement value thereof and with such loss payable and other endorsements as Secured Party may require, plus such other insurance as Secured Party may specify from time to time. Debtor shall immediately notify Secured Party of any loss, theft or damage to any Collateral. Secured Party may alter the insurance requirements under this Section, as Secured Party reasonably deems necessary, by giving written notice to Debtor. Secured Party's acceptance of policies in lesser amounts in one instance shall not be a waiver of Debtor's obligations hereunder in any other instances. Debtor hereby agrees that Secured Party may act as Debtor's representative in making, adjusting and settling claims with respect to the Collateral under any such insurance policies, and endorsing Debtor's name on any drafts, checks or other instruments drawn by an insurer and relating to the Collateral. In the event of Debtor's failure to secure and maintain insurance as herein required, Secured Party may, to protect and insure the Collateral, at its sole option, secure such insurance on behalf of Debtor, and Debtor hereby promises to pay to Secured Party on demand any amounts expended by Secured Party as part of the obligations, payment of which is secured by the Collateral pursuant to this Agreement. Insurance purchased by Secured Party may include coverage beyond those required by this Section. Secured Party's affiliates may act as insurance carrier, premium finance company and/or insurance administrator, and may be compensated through premium charges, commissions, premium rebates and fees. Debtor acknowledges that any insurance obtained by Secured Party is solely for the benefit of Secured Party and may be more expensive than insurance obtained by Debtor. Secured Party will promptly discontinue any insurance purchased by Secured Party upon Debtor's presentation of proper evidence of valid insurance meeting the requirements of this Section.

10. Event of Default.
Debtor and Secured Party acknowledge that time is of the essence in this Agreement. "Event of Default" in this Agreement shall mean any one or combination of the following:
(a) any of Debtor's obligations to Secured Party and/or any affiliate of Secured Party under this Agreement, any FTD or any other agreement are not paid or performed as required; (b) there occurs a default by any affiliate of Debtor under any agreement with Secured Party and/or any affiliate of Secured Party; (c) any sale or other disposition of the Inventory is made by Debtor other than in compliance with Section 8 of this Agreement; (d) Debtor breaches any representation, warranty or covenant contained herein or in any other instrument or agreement delivered by Debtor to Secured Party or any affiliate of Secured Party in connection with this Agreement or any other transaction; (e) Debtor dies, ceases to do business as a going concern or there occurs a material change in the ownership or management of Debtor's business; (f) any of the Inventory is lost, damaged or destroyed and Debtor fails to pay to Secured Party within five (5) days thereafter (the "Grace Period"), the unpaid Invoice Cost of such Inventory. If Secured Party seeks payment for any Inventory from the proceeds of the insurance described in Section 9 of this Agreement, then the Grace Period will not begin for such Inventory until Secured Party gives notice to Debtor that Debtor must make payment for such Inventory; (g) Debtor becomes insolvent or bankrupt; makes an assignment for the benefit of creditors or consents to the appointment of a trustee or receiver; a trustee or a receiver is appointed for Debtor or for a substantial part of its property without its consent; bankruptcy, reorganization or insolvency proceedings are instituted by or against Debtor ; or if any of the foregoing occurs with respect to any guarantor or other party liable for any of Debtor's and/or its affiliates obligations to Secured Party and/or its affiliates; (h) all or any part of the Inventory is attached, levied or seized upon in any proceeding and such process is not discharged within ten (10) days; (i) Secured Party believes that the prospect of payment or performance of Debtor's and/or its affiliates obligations to Secured Party and/or its affiliates is impaired, whether by reason of a material adverse change in the business prospects or financial condition of Debtor or otherwise, or, in good faith, believes that the Collateral is insufficient security for Debtor's obligations to Secured Party; or (j) any guarantor, surety or endorser for any of Debtor's and/or its affiliate's obligations to Secured Party and/or its affiliates dies, defaults in any obligation or liability owing to Secured Party or any affiliate of Secured Party, or any guaranty of the obligations secured hereby is terminated.

11. Remedies for an Event of Default.
If an Event of Default occurs, the indebtedness herein described and all other debts then owing by Debtor to Secured Party and/or its affiliates under this Agreement or any other present or future agreement (the "Obligations") shall, if Secured Party shall so elect, become immediately due and payable, provided, however, that upon the institution of any bankruptcy, reorganization or insolvency proceedings filed by or against Debtor, the Obligations shall automatically become immediately due and payable without notice or demand of any kind. In addition, Debtor agrees that Secured Party may charge Debtor a default rate of interest on all then owing obligations ("Default Rate"). Said Default Rate shall not exceed that set forth in an FTD, or in any event, a rate prohibited by law. Furthermore, if an Event of Default occurs, Secured Party shall have all of the rights and remedies of a secured party under the Uniform Commercial Code and any other applicable laws. Debtor agrees that Secured Party may, by itself or through an agent, without notice to any person and without judicial process of any kind, enter into any premises or upon any land owned, leased or otherwise under the apparent control of Debtor where Secured Party believes the Collateral may be, and disassemble, render unusable and/or repossess all or any items of the Collateral. Debtor expressly waives all rights to possession of the Collateral after default and all claims for injuries suffered through or loss caused by such entering and/or repossession by Secured Party. Debtor shall, upon demand by Secured Party, assemble the Collateral and return it to Secured Party at a place designated by Secured Party. Debtor agrees that the repurchase of any item of Collateral by the manufacturer or any distributor thereof shall constitute a commercially reasonable private sale of the Collateral by Secured Party, if the price obtained is equal to: (a) the then outstanding Invoice Cost of such item of Collateral, minus (b) the sum of all (i) unpaid principal curtailments on the Collateral (which Debtor agrees will approximate the depreciation of the Collateral) and (ii) amounts incurred, if any, to restore such item of Collateral to the equivalent of unused condition. Expenses of retaking, holding, preparing for sale, selling and the like shall include attorney's fees and other legal expenses and shall be the responsibility of Debtor. Debtor is also responsible to pay all other costs and expenses incurred by Secured Party in connection with this Agreement, including but not limited to attorneys' fees and other legal expenses in connection with or arising out of any deficiency suit, collection actions or otherwise following an Event of Default. All such costs and expenses are payable by Debtor on demand by Secured Party and constitute part of the obligations of Debtor secured by this Agreement. Debtor understands that Secured Party's rights are cumulative and not alternative. Debtor hereby expressly waives notice of non-payment, presentment, protest, dishonor, default, intent to accelerate the maturity hereof and acceleration of the maturity hereof.

12. Waiver of Defaults; Agreement Inclusive.
Secured Party may, in its sole discretion, waive a default or cure a default at Debtor's expense. Any such waiver in any particular instance or any waiver of a particular default shall not be a waiver of any other defaults at the same time or at any other time. No provision of this Agreement shall be varied or modified by any prior or subsequent statement, conduct or act of any of the parties, except by a writing specifically referring to this Agreement and signed by all parties hereto. No course of dealing, course of performance, or usage of trade shall be considered in the interpretation or enforcement of this Agreement. Debtor waives any right it may have to introduce evidence of any such course of dealing, course of performance or usage of trade. This Agreement may be executed in two or more counterparts, each of which, when so executed and delivered, shall be an original, but all of which together shall constitute one and the same document. This Agreement and each applicable FTD contain the entire agreement of the parties hereto with respect to the subject matter hereof. Delivery of an executed counterpart of this Agreement by facsimile or other electronic transmission shall be equally effective as delivery of an original executed counterpart of this Agreement.

13. Financing Statements; Financial Information.
Debtor shall take all actions that Secured Party from time to time reasonably deems necessary or appropriate to protect and perfect its security interest in the Collateral. Debtor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any filing office in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto which, among other things, list the Collateral and provide any other information required to evidence the agreements set forth herein, or as may be amended from time to time, or for sufficiency or filing office acceptance. Debtor also ratifies its authorization for Secured Party to have filed in any Uniform Commercial Code jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof. Unless otherwise agreed to in writing by Secured Party, Debtor will deliver to Secured Party, within ninety (90) days after the close of each fiscal year of Debtor, Debtor's balance sheet, and statement of income ("Financial Statements"), certified by a recognized firm of certified public accountants as having been prepared in accordance with generally accepted accounting principles and as presenting fairly the financial condition of Debtor as of the date thereof and for the period then ended. Upon request, Debtor will deliver to Secured Party (i) within (90) days after the close of each fiscal quarter of Debtor, copies of Debtor's quarterly Financial Statements certified by the chief financial officer of Debtor as presenting fairly the financial condition of Debtor as of the date hereof and for the period then ended and (ii) such other financial statements or information regarding Debtor or the Collateral, as Secured Party reasonably may request from time to time.

14. Power of Attorney and Consent.
To facilitate and carry out the purposes of this Agreement and Debtor's obligations to Secured Party, Debtor hereby irrevocably appoints Secured Party and its affiliates, as Debtor's true and lawful attorney-in-fact, with power of substitution, to do the following acts on behalf of Debtor: to prepare, execute and deliver in the name of Debtor security agreements, financing statements, Certificates of Title and Statements of Origin relating to the Collateral; to endorse Debtor's name upon any notes, checks, drafts, money orders and other forms of instruments made payable to Debtor; and generally to perform all acts and do all things necessary to preserve and protect the Collateral and Secured Party's rights and interest therein and to otherwise accomplish the purposes of this Agreement, including the making of affidavits and the acknowledgment of instruments as fully as if done by the Debtor. The foregoing powers are coupled with an interest and shall be irrevocable without the prior written consent of Secured Party, as long as any obligations of Debtor to Secured Party remain outstanding.

15. Termination.
Either party may terminate this Agreement at any time by prior written notice received by the other party. If Secured Party terminates this Agreement, Debtor agrees that (i) if Debtor is not in default hereunder, forty five (45) days prior notice of termination is reasonable and sufficient (although this provision shall not be construed to mean that shorter periods may not, in particular circumstances, also be reasonable and sufficient) and (ii) if Debtor is in default hereunder, Secured Party may elect to terminate this Agreement immediately upon the giving of written notice to Debtor. Debtor will be obligated to Secured Party for Secured Party's advances or commitments to make advances made before the effective termination date of this Agreement.

16. Additional Provisions. Secured Party may correct patent errors and fill in blanks herein. Any provisions hereof contrary to, prohibited by, or invalid under applicable law shall be inapplicable hereto, deemed omitted here from, and shall not invalidate the remaining provisions hereof. Secured Party may establish a credit limit for Debtor and may adjust such credit limit from time to time. Such credit limit does not constitute a commitment or committed line of credit from Secured Party. It is the intention of Secured party not to charge interest pursuant to the FTD at a rate in excess of the highest rate permitted by applicable law. In making such determination, interest on any outstanding credit amount shall be spread over the entire period that such credit amount is outstanding. Debtor acknowledges that it has read and understood this Agreement and received a true copy hereof, and waives notice of Secured Party's acceptance hereof. Secured Party's failure to charge or accrue interest or any other fees provided herein shall not be deemed a waiver by Secured Party of its claim thereto. If more than one party executes this Agreement as Debtor, (i) each such party agrees that their obligations hereunder are joint and several notwithstanding that they may be referred to herein in the singular as "Debtor"; (ii) each such party represents and warrants that it is an affiliate of the other and expects to directly or indirectly benefit from the extension of credit by Secured Party contemplated by this Agreement; and (iii) each such party agrees that Secured Party may change any terms of the obligations of any such party, impair or release any security, release, compound or substitute any such party or any guarantors, or take any other action that may increase any such party's risk or expose it to greater liability, in each case without discharging any such party's obligations hereunder or otherwise. This Agreement and any related instruments and documents may be endorsed, assigned and transferred in whole or in part by Secured Party, and any such holder and/or assignee of this Agreement shall succeed to and be possessed of the rights of Secured Party under this Agreement to the extent transferred and assigned. The rights and obligations of Debtor may not be assigned without the prior written consent of Secured Party. All notices, demands and requests required or permitted to be given under this Agreement shall be in writing and delivered by either: (i) personal delivery; (ii) nationally recognized overnight express courier; (iii) facsimile, email or other electronic transmission, or (iv) certified mail, return receipt requested, with all postage and other costs of such delivery paid or prepaid. Delivery shall be deemed to have been made on the earliest of the date of personal delivery, the date one business day after dispatch by overnight express service, the date of confirmation of the facsimile or email transmission as provided by the transmitting equipment or the date five days after the date of mailing by certified mail. Unless and until notice is provided to the contrary, notices shall be addressed to the respective addresses set forth below or to any other or additional persons and addresses as the parties may from time to time designate in a writing sent as provided above. Any claim which Debtor may have against Secured Party arising out of this Agreement or the transactions contemplated herein must be asserted by Debtor within one (1) year of it accruing or else it shall be deemed waived. Debtor agrees that such period is reasonable and sufficient for it to investigate and act upon any such claim. **This Agreement shall be governed, construed and enforced in accordance with the laws of the State of Rhode Island without reference to conflict of laws principles. Debtor consents to the exclusive jurisdiction of the Courts of the State of Rhode Island, sitting in Providence, Rhode Island and the United States District Court for the District of Rhode Island for all purposes in connection with this Agreement. Debtor hereby waives and agrees not to assert any objection to the jurisdiction of any of such Courts, including the objection of inconvenient forum. Debtor further consents that any process or notice of motion or other application to any of said Courts or a Judge thereof, or any notice in connection with any proceedings hereunder, may be served inside or outside the State of or the District of Rhode Island by registered or certified mail, return receipt requested, to the last known address or by personal service provided a reasonable time for appearance is allowed, or in such other manner as may be permissible under the Rules of said Courts. To the extent permitted by law, each party hereto, following consultation with legal counsel, KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS WITH REGARD TO DISPUTES IN ANY WAY DIRECTLY AND/OR INDIRECTLY ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT. THE PARTIES ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS. The provisions of this Section shall survive termination of this Agreement and any other documents relating to or executed in connection herewith.**

Upon signature by all parties hereto, this Agreement shall have an effective date of 4-9, 2007

**SECURED PARTY:**
TEXTRON FINANCIAL CORPORATION, for itself and as agent for its affiliates
By: [signature]
Print Name: Michael Scott
Print Title: Chief Credit Officer

Secured Party's address for notices:
2 Walnut Grove Drive
Suite 310
Horsham, PA 19044

**DEBTOR:**
Enterprise Direct L.L.C.
By: [signature]
Print Name: Kevin Arrigker
Print Title: President

**WITNESS FOR DEBTOR'S SIGNATURE:**
By: [signature]
Print Name: Larry Ruden E
Home Address: 507 E. Eleana Dr
Gilbert AZ 85298

Debtor's principal place of business and address for notices:

Street: 9831 South 51st Street, Ste. #128
City: Phoenix State: AZ
Zip: 85048
Name(s) of Debtor's other partner(s) (if applicable):
Joseph Monahan